**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____
                                    :
GIDGET MOCK,                        :        CIVIL ACTION
                                    :
            Plaintiff,              :
                                    :
    v.                              :        No. 07-3607
                                    :
                                    :
NORTHAMPTON COUNTY SHERIFF'S        :
DEPARTMENT,                         :
                                    :
            Defendant.              :
_____:

**MEMORANDUM**

**ROBERT F. KELLY, Sr. J.**                                **AUGUST 5, 2008**

        Presently before this Court is a Motion for Summary Judgment filed by Defendant,

Northampton County Sheriff's Department (the "NCSD").  For the following reasons, the

Motion will be granted in part and denied in part.

**I.      BACKGROUND**

        Plaintiff Gidget Mock ("Mock") works as a part-time phlebotomist for the Northampton

County DUI Processing Center (the "DUI Center"), and has done so since November 1, 1999.

Mock alleges that while employed in that capacity between November, 2003, and May, 2005, she

was sexually harassed, and discriminated and retaliated against by her co-workers and superiors.

        On November 6, 2003, members of the NCSD evicted her from her home pursuant to a

foreclosure action that had been initiated on the property against the owner.  Mock's parents

owned the home, which was divided into two apartments, and Mock rented from them.  At the

time of her eviction, Mock witnessed the NCSD ransacking her house, and rifling through her

dresser drawers.  In so doing, they came upon her lingerie, which included teddies and thong underwear, as well as provocative photographs she had of herself.  The photographs included one of Mock dressed in a teddy, and one of her dressed in only a red feather boa.  After members of the NCSD encountered these items, unnamed NCSD employees proceeded to make comments to Mock about the lingerie and the pictures.  Mock claims that following her eviction on November 6, 2003, she was subjected to increasingly more frequent and vulgar conduct by members of the NCSD.  Mock first complained about the behavior of the NCSD towards her to Mark Heimbach, director of the DUI Center, on March 5, 2004.

Mock alleges that three individuals in particular regularly engaged in sexually harassing behavior towards her.  The first person was Craig Marshall, a police officer in Northampton County whose duties frequently brought him in contact with Mock at the DUI Center.  Marshall was an employee of the DUI Center from 1994 until 2004, but has since resigned his position.[1] Mock claims that Marshall repeatedly made sexual comments to her after her eviction about her lingerie and other things.  Additionally, she has described one incident that occurred prior to her eviction.  Mock reported that Marshall had acted inappropriately with the video equipment at the DUI Center on an unspecified evening prior to November 6, 2003.  The camera was used by DUI Center staff to record suspect intake interviews.  Marshall, however, used the video camera to record Mock while she was working, which focused on her crotch and buttocks.  Mock noted that

---

[1] The Northampton County human resource director contends that Marshall resigned his position with the DUI Center as of November 2, 2003.  However, staffing records provided by Mock show that Marshall was included on the assignment schedules at the DUI Center through March of 2004.  Since all inferences must be drawn in a light most favorable to the non-movant, this Court must resolve this dispute in favor of Mock for the purposes of this Memorandum.  This Court assumes for the purposes of this Memorandum that Marshall was employed by the NCSD when the events alleged in the Complaint occurred.  See Matsushita Elec. Indus. Co., v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986).

she was wearing shorts when this happened, and that she, Marshall, and a third person were working at the DUI Center that night.  Marshall then showed the tape to the other employee, who was also male, and both men made comments to Mock about her having a "nice butt."

Mock's other complaints about Marshall and other NCSD employees involve incidents that occurred after she was evicted from her home.  Marshall continued to remark about Mock's "nice butt" for a long time after the video incident.  He also frequently asked her about thong underwear, and routinely inquired as to whether she was wearing a thong when he saw her, and what color her thongs were.  Mock described one instance in particular.  Mock was out to dinner one night when she received a call that she was needed to process a suspect (she was on-call at the time).  She proceeded directly to the DUI Center, instead of going home to change her clothes first.  Thus, she was still wearing the black dress she had gone out in when she arrived at the DUI Center.  Almost as soon as she walked into the center, Marshall asked her whether she was wearing a black thong underneath her dress.  Mock brushed aside the comment, and processed the suspect.  When she was finished, she told Marshall she was going home to change, and would be back shortly.  During this exchange, another employee working that night, Mike Calabrese, felt compelled to chime in.  Calabrese said to Mock that she should not have a problem stripping down in front of them, and he thought that she should show him and Marshall her thong.  Mock thereafter went home to change.

The final instance Mock relayed involved Marshall whispering in her ear that he wanted to "have a three-way" with her.  Marshall made this remark while he and Mock were working at the DUI Center as well.  Mock attests that Marshall made sexual comments like those described above until approximately August, 2004.

3

The second individual Mock has voiced concerns about is Jeremy McClymont, a deputy sheriff in the NCSD.  Mock stated that McClymont frequently asked her about thong underwear and other undergarments.  McClymont also repeatedly asked her what color underwear she was wearing, or whether she had on certain articles of lingerie.  Mock thought McClymont had a strange fascination with her undergarments, and she repeatedly complained to her co-workers and her supervisors about McClymont's sexually inappropriate comments and behavior.  On an evening in March, 2004, Mock was working at the DUI Center when McClymont brought a suspected drunk driver in for processing.  McClymont pulled her aside upon entering the building to tell her something, which Mock assumed pertained to the suspect.  She testified that officers bringing suspects in regularly pull the DUI Center staff aside to inform them of issues.  However, McClymont did not talk about the suspect, rather he said to her, "I just jerked off in your thong underwear watching a movie on your TV last night."  Mock claims that McClymont continued making sexually charged comments to her whenever he brought suspected drunk drivers to the DUI Center for processing.

The third individual Mock complains about is George Bruneio, her supervisor at the DUI Center.  Mock alleges that Bruneio subjected her to physical and verbal sexual harassment on multiple occasions.  In February or March of 2004, Mock went to see Bruneio at his office in Freemansburg to complain about the inappropriate behavior of Marshall and McClymont.  When Mock walked into his office, Bruneio got up from his seat, and acted like he was going to close the door behind her.  Instead, he cornered Mock, and asked her if she was wearing a padded bra.  Mock told Bruneio that she did not appreciate his comment.  She also stated at that time that she wanted all the comments about her lingerie to stop.  In a later incident, Bruneio attempted to

4

touch her breasts when he walked past her in a corridor at the DUI Center.

In August, 2004, Mock again met with Bruneio at his Freemansburg office, and during this meeting, Bruneio made contact with her breast.  Like the previous encounter earlier in the year, Mock entered the office, and Bruneio got up to shut the door.  After closing it, Bruneio escorted Mock to a chair, and touched her breast while doing so.  Mock attested to the fact that Bruneio said after he touched her breast that he was happy to know that she was not wearing a padded bra that day.  Further, when Mock then got up to leave, Bruneio acted like he was going to "smack [her] ass" as she walked by him.  Mock said that Bruneio frequently acted like he was going to "smack [her] ass."

Mock also stated that Bruneio made a comment to her in August, 2004, which she perceived as sexual in nature.  Mock had a job performance problem, and in resolving the issue, Bruneio said to her that "he would cover [her] pretty little ass but [she] would have to remember she owe[d] him a favor."  Mock believed that the favor that he referred to involved the feather boa, because Bruneio frequently mentioned feather boas when he talked to Mock.  Most of his comments were made over the phone during work related calls.  Mock stated that Bruneio told her on numerous occasions that she should bring her feather boa to work, and he made these comments to her throughout 2005.

Mock also experienced one incident that she has not attributed to any particular actor.  On May 8, 2005, Mock and her attorney returned to the residence to retrieve her personal belongings, which were retained after her eviction.  Mock was given access to the premises via a court order.  When Mock and her attorney entered the house, they saw that Mock's possessions had been put in bags on the floor.  They also encountered two items laid out on a counter-top in the kitchen.

5

One was a police nightstick, and the other was a strap-on-dildo.  Mock's attorney confirmed her account of this event in a letter he sent to the Equal Employment Opportunity Commission. Mock testified that the members of the NCSD carry nightsticks, but she rarely sees them wearing them on their person while in the DUI Center.  This was the act that prompted Mock to file a charge with the appropriate commonwealth and federal agencies for sexual harassment.

Mock has also stated that she received stiffer penalties for her infractions of DUI Center policy than one other man and woman who also worked at the DUI Center.  On the weekend of February 14–15, 2004, Mock was scheduled to work two consecutive six hour shifts at the DUI Center.  She did not work the majority of those two shifts, but she filed a time sheet stating that completed twelve hours of work.  Because of this infraction, Mock was temporarily removed from the schedule for the remainder of February.  This disciplinary action prompted the meeting Mock had with Heimbach on March 5, 2004, where she reported the harassment discussed above. Mock testified that two other employees, Judy Hogan and a man she knew only as "Brandon," committed the same infraction, but were not temporarily suspended from the schedule.  Rather, those employees were punished by being docked a few hours of pay.  Mock was also disciplined in August, 2004, for missing a shift on July 23, 2004.  She received a written reprimand for this incident. But has not stated that this penalty was any different than what other people received.

Finally, Mock has testified that after she reported the harassing activity of Marshall, McClymont, and Bruneio, her hours have been progressively reduced since 2003.  Specifically, Mock cites her drop in hours between 2003 and 2004 as evidence that her reduction in hours was the result of retaliation.  The time records from the DUI Center, which were provided in the NCSD's answer to plaintiff's first set of interrogatories, show that Mock worked the following

hours during the years 2003–2008:

    2003   1,379.75 hours
    2004   704.25 hours
    2005   813 hours
    2006   1,088 hours
    2007   875 hours
    2008   73 hours (as of April 4, 2008)

(Def.s Mot. Summ. J., Ex. 9, Resp. to Interrogs.)  The data includes statistics for all nine of the

phlebotomists that the NCSD employed during these two years.

Mock filed charges with the Pennsylvania Human Relations Committee and the Equal

Employment Opportunity Commission ("EEOC") in July, 2005.  She was issued a right to sue

letter by the EEOC on June 7, 2007.  Mock filed a civil action in this Court on August 29, 2007.

Her Complaint alleges two counts against the NCSD.  Count I states a claim for violations of 42

U.S.C. § 2000(e), the Civil Rights Act ("Title VII").  Mock brings this claim under three theories

of sex discrimination: hostile work environment, individual disparate treatment, and retaliation.

Count II alleges violations of 43 P.S. § 951, the Pennsylvania Human Relations Act (the

"PHRA").  On June 16, 2008, the NCSD filed a Motion for Summary Judgment.  Mock filed her

Response in Opposition on July 15, 2008.

## II.   STANDARD OF REVIEW

Summary judgment is proper when "there is no genuine issue as to any material fact and

. . . the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see Hines v.

Consol. Rail Corp., 926 F.2d 262, 267 (3d Cir. 1991).  A court must determine "whether the

evidence presents a sufficient disagreement to require submission to the jury or whether it is so

one-sided that one party must prevail as a matter of law."  Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 251-52 (1986).  In the absence of any material factual disputes, summary judgment

must be granted against "a party who fails to make a showing sufficient to establish the existence

of an element essential to that party's case, and on which that party will bear the burden of proof

at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

This Court is required, "before the evidence is left to the jury," to determine "whether

there is any [evidence] upon which a jury could properly proceed to find a verdict for the party

producing it, upon whom the onus of proof is imposed." Anderson, 477 U.S. at 251.  A "judge's

inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of

the evidence that the plaintiff is entitled to a verdict[.]" Id. at 252.  "The mere existence of a

scintilla of evidence in support of the plaintiff's position will be insufficient; there must be

evidence on which the jury could reasonably find for the plaintiff." Id.  "[S]ummary judgment

should be granted where the evidence is such that it would require a directed verdict for the

moving party[.]" Id. at 251.

## III.    DISCUSSION

**A.    Title VII of the Civil Rights Act, 42 U.S.C. § 2000(e), et. seq.**

### 1.    Sexual harassment: hostile work environment

#### a.    Limitations period under Title VII

The first issue this Court must address is the NCSD's contention that Mock's claims are

time-barred under Title VII.  The ordinary time for filing a charge of employment discrimination

with the EEOC is 300 days after the alleged discrete action occurred.  42 U.S.C. § 2000e-5(e)(1).

Mock stated in her Complaint that she first reported the harassment to the EEOC in July, 2005.

(Compl. ¶ 6.)  This Court will infer for the purpose of this Memorandum that Mock filed a

8

charge with the EEOC on July 1, 2005, as no specific date has been provided.  Consequently, the discriminatory actions for which Mock seeks redress must have occurred on of after September 4, 2004, in order to be actionable under Title VII.[2]

In both her Complaint and deposition, Mock states that she was subjected to a sexually harassing event on May 8, 2005.  (Compl. ¶ 20; Pl.'s Opp. Ex. A, Mock Dep. at 124 ["hereinafter Mock Dep."].)  Since this event is well within the 300 day period, Mock can proceed with her claim under Title VII regarding this event.  However, Mock has also complained about many instances of sexual harassment that occurred during February, March, and August, 2004, all of which happened more than 300 days before July 1, 2005.  (Compl. ¶¶ 20-21; Mock Dep. at 31 passim.)  The NCSD argues that Mock should be barred from bringing her claims in regard to these incidents, as it believes that any claim based on these occurrences is time-barred.  Mock contends that by virtue of the continuing violation doctrine, all of the allegations contained in her Complaint are timely.

"The continuing violation theory allows a plaintiff to pursue a Title VII claim for discriminatory conduct that began prior to the filing period if [s]he can demonstrate that the act is part of an ongoing practice or pattern of discrimination of the defendant."  Rush v. Scott Speciality Gases, Inc., 113 F.3d 476, 481 (3d Cir. 1997) (internal quotation omitted).  Gaining the benefit of the doctrine requires the plaintiff to first "show that at least one discriminatory act occurred within the 300 day period."  Id.  Secondly, "the plaintiff must show that the harassment is more than the occurrence of isolated or sporadic acts of intentional discrimination, and instead

---

[2] The NCSD contends that Mock did not file a charge with the EEOC until October 6, 2005, but for the purposes of its Motion, the NCSD has conceded that Mock filed her charge on July 1, 2005.  (Def.'s Mot. Summ. J. at 10-11.)

must demonstrate a continuing pattern of discrimination." Id. "A plaintiff satisfying these requirements may present evidence and recover damages for the entire continuing violation, and the 300-day filing period will not act as a bar." Id.

Mock has shown that one discriminatory act occurred during the 300 day period, and therefore satisfies the first prong. With regard to whether Mock can establish the second prong, the Third Circuit has enumerated some considerations this Court should use in making a determination about whether a plaintiff can show a continuing pattern of discrimination. The Third Circuit wrote:

> The first is subject matter. Do the alleged acts involve the same type of discrimination, tending to connect them in a continuing violation? The second is frequency. Are the alleged acts recurring ... or more in the nature of an isolated work assignment or employment decision? The third factor, perhaps of most importance, is degree of permanence. Does the act have the degree of permanence which should trigger an employee's awareness of and duty to assert this or her rights, or which should indicate to the employee that the continued existence of the adverse consequences of the act is to be expected without being dependent on a continuing intent to discriminate?

Id. at 481-82.

Mock has clearly shown that the subject matter of the incident on May 8, 2005, which involved a sex toy, and the comments she was subjected to in 2004, which included references to having sex with her, is the same. (Mock Dep. at 68-80, 86-88, 99-108, 122-25.) Mock has also shown that the incidents were recurring. The comments about her underwear began when the NCSD evicted her from her home in November, 2003. (Mock Dep. at 55-57.) In February, 2004, Marshall told her he wanted to have a "three way" with her. (Id. at 68.) In March, 2004, she stated that McClymont told her that he had masturbated with a pair of her underwear. (Id. at 86-87.) In August, 2004, Bruneio touched her breast during a meeting, and told her he would

"cover [her] pretty little ass[.]"  (Id. at 104-08.)  And in May, 2005, after she obtained a court order to return to the premises and retrieve her belongings, she was exposed to a sex toy left out in plain view on the counter upon entering the abode.  (Id. at 124.)  Mock has established that the harassment was recurring.

Regarding the third factor, degree of permanence, the Third Circuit has stated that "there is a natural affinity between the theory underlying hostile environment claims and the continuing violation theory."  Rush, 113 F.3d at 482.  "A sexually hostile work environment often results from acts of sexual harassment which are pervasive and continue over time, whereas isolated or single incidents of harassment are insufficient to constitute a hostile environment."  Id.  The court also noted that there is an overwhelming "desire to encourage plaintiffs to commence litigation when they become aware of conduct that would support a viable claim without forcing them to do so prematurely."  Id.

The NCSD argues that a sufficient number of incidents occurred prior to September 4, 2004, which should have put Mock on notice of a duty to assert her rights at that point in time. The NCSD further contends that since she did not complain about the activity on or before that date, she should not be given the benefit of utilizing the continuing violation doctrine now.  This Court does not agree.  A plaintiff can prove a hostile work environment claim by establishing that the conduct was severe or pervasive.  Andreoli v. Gates, 482 F.3d 641, 643 (3d Cir. 2007). None of the incidents that Mock alleges occurred prior to September 4, 2004, is "severe" enough itself to support a claim for sexual harassment under Title VII.  Mock must therefore show that the conduct she was subjected was sufficiently "pervasive" to prove her case.

Pervasiveness is established by proving a regular pattern of behavior over time.  Prior to

September 4, 2004, Mock had only been subjected to sexual comments and one inappropriate touching that could reasonably be held to be merely isolated incidents.  Given that a hostile work environment cannot be proven by conduct that is merely "episodic," it is unreasonable to assume that Mock should have been on notice that she had a duty to assert her rights at that time.  See Faragher v. City of Boca Raton, 524 U.S. 775, 787 n.1 (1998).  However, this Court finds that at the time the sex toy was included with Mock's personal effects, she alleges she had endured a continuous string of comments and actions for almost two years, and at this point a reasonable person should be aware that they had a viable claim for sexual harassment.  Since Mock asserted her rights within 300 days after the May 8, 2005, incident, she has established the third element of the test, and must be afforded the benefit of the continuing violation doctrine.  See Rush, 113 F.3d at 482.

> **b.**    **Prima facie elements**

A hostile work environment is one "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment[.]"  Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (internal quotes omitted).  A hostile work environment is a violation of Title VII of the Civil Rights Act, which makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to [the] . . . terms, conditions, or privileges of employment, because of such individual's . . . sex[.]"  42 U.S.C. § 2000e-2(a)(1); see also Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 66 (1986).

The NCSD argues that Mock has failed to establish the prima facie elements of a claim for a hostile work environment.  In order to prove her hostile work environment claim, Mock

must show five things: (1) that she suffered intentional discrimination because of her sex, (2) the discrimination was severe or pervasive,[3] (3) it detrimentally affected her, (4) it would have detrimentally affected a reasonable person in like circumstances, and (5) there is a basis for employer liability.  Andreoli, 482 F.3d at 643.  For the purposes of its Motion, the NCSD has conceded that Mock can establish the first, third, and fifth elements of this test.  (Def.'s Mot. Summ. J. at 13.)

The NCSD argues that Mock cannot establish either that the alleged discrimination was severe or pervasive, or that the conduct she was subjected to would detrimentally affect a reasonable person in like circumstances.  "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview."  Harris, 510 U.S. at 21. The lower courts have been given the task of determining whether working environments are sufficiently hostile or abusive to incur Title VII liability.  Faragher, 524 U.S. at 787-88.  The Supreme Court has "directed courts to determine whether an environment is sufficiently hostile or abusive by 'looking at all the circumstances,' including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"  Id.

"A recurring point in [the Supreme Court's decisions] is that simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory

---

[3] The Third Circuit frequently uses the phrase "pervasive and regular" when discussing this element of the test.  See e.g. Andrews v. City of Phila., 895 F.2d 1469, 1482 (3d Cir. 1990).  However, as the Third Circuit has noted, the Supreme Court's formulation is "severe or pervasive," and the use of those words is important.  Jensen v. Potter, 435 F.3d 444, 449 n. 3 (3d Cir. 2006) (abrogated in part on other grounds by Burlington N. & Sante Fe Ry. Co. v. White, 548 U.S. 53 (2006)).  As the Supreme Court's standard is "severe or pervasive," that formulation will be applied in this case.

changes in the terms and conditions of employment." Id. at 788.  Pervasiveness is not shown

without conduct that is "more that episodic; [it] must be sufficiently continuous and concerted in

order to be deemed pervasive." Id. at 787 n. 1.  Most importantly, Title VII does not impose a

general civility code on the workplace, and the standards for judging hostility are intentionally

demanding so that complaints attacking the ordinary tribulations of the workplace are filtered

out. Id. at 788.  Courts and juries must ensure that they "do not mistake ordinary socializing in

the workplace—such as male-on-male horseplay or intersexual flirtation—for discriminatory

conditions of employment." Oncale v. Sundowner Offshore Serv., Inc., 523 U.S. 75, 81 (1998).

  The NCSD has failed to show in this case that Mock has presented no evidence on which

she can establish the severe or pervasive element of her prima facie case.  Mock has given

testimony that, if accepted by a jury, could establish the pervasiveness necessary to prove sexual

harassment.  Mock has shown that for nearly two years she was subjected to comments about her

underwear and provocative pictures found in her house, a remark by another employee about

having a "three way" with her, a remark from another coworker describing how he masturbated

into a pair of her underwear, inappropriate touching from her superior, and the inclusion of a sex

toy with her personal belongings.  (Mock Dep. at 68-80, 86-88, 99-108, 122-25.)  These incidents

are more than episodic, and they fall outside of the rubric of simple teasing or the ordinary trials

or tribulations of the workplace.  This Court also finds that this behavior would detrimentally

affect a reasonable person in Mock's position.  Consequently, this Court must deny the NCSD's

Motion for Summary Judgment insofar as it seeks to preclude Mock from moving forward with a

claim for a hostile work environment under either Count I or Count II.[4]

### 2.      Individual disparate treatment

"The essence of disparate treatment is different treatment."  Barbara Lindemann & Paul Grossman, Employment Discrimination Law 9 (3d ed. 1976).  Employers are prohibited under Title VII from intentionally treating people differently because of certain characteristics they may possess.  The statute makes it "an unlawful employment practice . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]" 42 U.S.C. § 2000e-2(a)(1).

The vital question in a disparate treatment case is always whether the defendant was motivated to act because of a discriminatory intent.  Lewis v. Univ. of Pittsburgh, 725 F.2d 910, 914 (3d Cir. 1983) (plaintiff must show that the alleged unlawful action bore a discriminatory animus against her in order to establish a disparate treatment claim).  Plaintiffs frequently lack direct evidence in employment discrimination cases, and may instead prove discrimination indirectly by inference.  When circumstantial evidence is used to prove intent, the action must be analyzed under the three part burden shifting framework established by the Supreme Court in McDonnell Douglas Corp. v. Green,  411 U.S. 792, 802 (1973).

The framework requires the plaintiff to first establish the prima facie elements of her

---

[4] Count II states a violation of the PHRA, which makes it unlawful to discriminate against individuals because of their "race, color, religious creed, ancestry, age, sex, national origin or non-job related handicap or disability[.]"  43 Pa. Cons. Stat. § 955(a).  Federal courts treat the PHRA and Title VII as embodying identical standards, and the analyses under these statutes are co-extensive; conduct that is unlawful under Title VII is similarly unlawful under the PHRA.  Weston v. Comm'w of Pa., 251 F.3d 420, 425 n. 3 (3d Cir. 2001); see also Bianchi v. City of Phila., 183 F. Supp. 2d 726, 734 n.4 (E.D. Pa. 2002).  Consequently, the disposition of the federal claim applies to the state law claim as well.

discrimination claim.  Id..  "The burden of establishing a prima facie case of disparate treatment

is not onerous."  Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981).

Showing the prima facie elements creates a rebuttable presumption of discrimination.  Brewer v.

Quaker State Oil Ref. Corp., 72 F.3d 326, 330 (3d Cir. 1995).  The defendant can rebut this

presumption by articulating legitimate non-discriminatory reason for the action taken against its

employee.  McDonnell Douglas, 411 U.S. at 802; Burdine, 450 U.S. at 253-55.  If a legitimate

reason is offered, the plaintiff then gets a chance to prove by a preponderance of the evidence

that the legitimate reason was not the true reason, but rather was just a pretext for discrimination.

Burdine, 450 U.S. at 253.

     To establish her prima facie case of disparate treatment, Mock must show that she (1) is a

member of a protected class, (2) was qualified for the position in question, (3) suffered an

adverse employment action, and (4) the circumstances support an inference of discrimination.

Swierkiewicz v. Sorema N. A., 534 U.S. 506, 510 (2002); Abramson v. Wm. Patterson Coll. of

N.J., 260 F.3d 265, 281-82 (3d Cir. 2001); Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410-11 (3d

Cir. 1999).  This Court will assume that Mock can establish the first and second elements of her

prima facie case.  The NCSD does not oppose this position.

     The NCSD argues that Mock cannot establish that she suffered an adverse employment

action.  Mock contends that the reduction in hours she suffered, as well as the discipline imposed

on her, constitute adverse employment actions under the standard.  An adverse employment

action is one that "alters the employee's compensation, terms, conditions, or privileges of

employment, deprives . . . her of employment opportunities, or adversely affects . . . her status as

an employee."  Moore v. City of Phila., 461 F.3d 331, 341 (3d Cir. 2006).  A reduction of hours

16

or the imposition of disciplinary action prompted by a plaintiff's sex would qualify as an adverse

employment action as it could deprive that plaintiff of employment opportunities or affect her

status as an employee.  Therefore, this Court will assume arguendo that Mock can establish the

third element of the test.

Regarding the fourth element, this Court must consider whether evidence has been

presented establishing that the circumstances surrounding Mock's reduction in hours and the

disciplinary actions support an inference of sex discrimination.  This Court finds that they do not.

First, the NCSD has shown that no evidence exists on which a reasonable jury could return a

verdict in Mock's favor regarding her claim of sex discrimination with regard to the decrease in

hours she recorded.  The data the NCSD provided shows that it employed eight other part time

phlebotomists in addition to Mock in 2003 and 2004.  Those eight employees also experienced

fluctuations in their hours similar to that experienced by Mock during these two years.  Of those

eight additional phlebotomists, six were female women and two were men.  Four women and one

man saw the hours they recorded in 2004 decrease from the amount they worked in 2003, while

the remaining man and two other women saw their hours increase from the previous year.

(Def.'s Mot. Summ. J., Ex. 9.)  That fact that women and men both gained and suffered refutes

any inference that Mock's fluctuation in hours was the product of sex discrimination.

Secondly, the disciplinary action taken against Mock in February, 2004, was the result of

her decision to submit a time sheet for hours she did not actually work.  (Mock Dep. at 35; Ex.

M, Letter from Heimbach.)  She was temporarily suspended for this action, and the facts do not

suggest that the NCSD was motivated by any other consideration.  While Mock argues that other

employees were treated differently, she has also stated that those employees were both female

17

and male.  (Mock Dep. at 141-42.)  This fact refutes Mock's assertion that the actions of the NCSD in this regard were sex based, as Mock herself contends that the sexes were treated equally.  Regarding the discipline she received in August, 2004, Mock has offered no testimony stating that she was treated any differently than other employees who also failed to report for scheduled shifts.

Mock cannot establish that the circumstances surrounding the incidents she contends are adverse employment actions support an inference that she was subjected to sex discrimination. Therefore, this summary judgment must be granted in the NCSD's favor regarding Counts I and II insofar as those claims allege that Mock suffered individual disparate treatment based on sex.

### 3.    Retaliation

Employers are prohibited from retaliating against employees who exercise their right to file discrimination charges against their employer.  It is an "unlawful employment practice for an employer to discriminate against any of his employees . . . because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).

"The anti-retaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm."  Burlington N. and Sante Fe Ry. Co. v. White, 548 U.S. 53, 67 (2006).  "A plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which . . . means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  Id. at 68.  "It is important to separate significant from trivial harms[,] as Title VII . . . does not set forth a general civility code

for the American workplace." Id. "[N]ot everything that makes an employee unhappy qualifies as retaliation, for otherwise, minor and even trivial employment actions that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit." Robinson v. City of Pittsburgh, 120 F.3d 1286, 1300 (3d Cir.1997) (abrogated by Burlington N., 548 U.S. at 67-68 on other grounds).

Retaliation, like disparate treatment, can be shown with circumstantial evidence. Thus, the familiar burden shifting framework of McDonnell Douglas must be utilized in this analysis. Woodson v. Scott Paper Co., 109 F.3d 913, 920 (3d Cir. 1997); Weston v. Comm'w of Penn., 251 F.3d 420, 430 (3d Cir. 2001). "To establish a prima facie case of retaliation, a plaintiff must show that: (1) she engaged in a protected employee activity; (2) the employer took an adverse employment action after or contemporaneous with the protected activity; and (3) a causal link exists between the protected activity and the adverse action." Weston, 251 F.3d at 430; see also Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1085 (3d Cir. 1996).

There is no dispute that Mock reported the behavior of Marshall, McClymont, and Bruneio on March 5, 2004. Thus she can establish the first element of the test. Regarding the second element, the NCSD argues that Mock has not presented any evidence establishing an adverse employment action. Mock contends that a decrease in hours and more severe discipline both constitute adverse actions because these things would dissuade a reasonable employee from making or supporting a charge of discrimination. These actions would dissuade a reasonable employee from asserting or defending her claim, and are therefore adverse. As far as the third element, the NCSD argues that Mock cannot establish the causal connection between the alleged harassment and the alleged retaliatory actions. This Court will assume arguendo that Mock can

19

establish that a causal connection exists, and will therefore impose the burden shifting framework under <u>McDonnell Douglas</u>.  The NCSD now has the responsibility of offering a legitimate non-discriminatory reason for the actions that it took.

First, with respect to the disciplinary actions imposed on Mock, the NCSD contends that Mock was punished in March and August of 2004 for her violations of DUI Center policy.  As noted previously, Mock was scheduled to work for two full six-hour shifts on February 15, 2004.  She did not work for two full shifts, but reported that she had worked the full twelve hours on her time sheet.  (Mock Dep. at 31-37.)  Mock received a letter stating that she was being punished for recording time that she did not work.  (Pl.'s Opp., Ex. L.)  On July 23, 2004, Mock was scheduled to work, but failed to show up for her shift.  (Mock Dep. at 38-39.)  She received a written reprimand on August 3, 2004, which stated that in accordance with DUI Center policy, she would be removed from the schedule for any additional missed shift.  (Pl.'s Opp., Ex. K.)  Thus, the NCSD has offered legitimate non-discriminatory reasons for its action, and the burden shifts back to Mock to offer evidence that the reasons asserted are merely a pretext.  However, Mock has failed to present any evidence from which a jury could reasonably find in her favor on the question of pretext.

Regarding the decrease in hours Mock experienced, the NCSD has shown that many of its phlebotomists had experienced similar fluctuations between 2003 and 2004.  Two-thirds of the phlebotomists employed during 2004 experienced a decrease in their hours from the previous year.  (Def.'s Mot. Summ. J., Ex. 9.)  While Mock did experience a much greater change in hours than those other employees, she testified that she suffered from conditions during 2004 that interfered with her ability to work.  (Mock Dep. at 43-44.)  She said that was inflicted with

cellulitis from May–June of 2004 and other ailments that diminished her capabilities, and caused her health to deteriorate to a point where she weighed 85 pounds and was constantly fighting bouts of bronchitis.  (Id. at 43-47.)  The NCSD has shown that there were legitimate non-discriminatory reasons for the decrease in hours Mock recorded in 2004.  The burden therefore shifts back to Mock again to present evidence showing that these reasons were a pretext.  Mock has not presented evidence in this instance either, which would allow a reasonable jury to infer that the reason given for her decrease in hours worked were pretextual.

Mock cannot establish her claim for retaliation under the McDonnell-Douglas burden shifting framework.  Consequently, summary judgment must be granted in favor of the NCSD, and Mock is precluded from going forward with her claims under Counts I and II insofar as she alleges discrimination under a theory of retaliation.

An appropriate Order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

---

|                                          |   |                |
|------------------------------------------|---|----------------|
| GIDGET MOCK,                             | : | CIVIL ACTION   |
|                                          | : |                |
| Plaintiff,                               | : |                |
|                                          | : |                |
| v.                                       | : | No. 07-3607    |
|                                          | : |                |
| NORTHAMPTON COUNTY SHERIFF'S             | : |                |
| DEPARTMENT,                              | : |                |
|                                          | : |                |
| Defendant.                               | : |                |

---

**ORDER**

      **AND NOW**, this   5th   day of August, 2008, upon consideration of Defendant

Northampton County Sheriff's Department's Motion for Summary Judgment (Doc. No. 11), and

the response and reply thereto, it is hereby **ORDERED** that the Motion is:

1.    **GRANTED** with respect to Counts I and II insofar as those claims allege that

        Plaintiff suffered individual disparate treatment based on sex or retaliation; but

2.    **DENIED** with respect to Plaintiff's claim of sexual harassment resulting from a

        hostile work environment as contained in Counts I and II.


                          BY THE COURT:


                           /s/ Robert F. Kelly          
                          ROBERT F. KELLY
                          SENIOR JUDGE